UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIAM C. LEDONNE | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) No. 05 C 1151 |
| v. | ) |
| | ) Hon. Marvin E. Aspen |
| AXA EQUITABLE LIFE INSURANCE CO., | ) |
| (f/k/a The Equitable Life Assurance Society of | ) |
| the United States), a New York Corporation, | ) |
| and WILLIAM CANADY, | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff William LeDonne filed a second amended complaint against Defendants AXA Equitable Life Insurance Co. ("AXA") and William Canady alleging breach of contract (Count I), unreasonable and vexatious denial of insurance benefits in violation of 215 ILCS § 5/155 (Count II), and violation of the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS § 505/1, *et seq.* (Count V). The parties have completed discovery. Presently before us is AXA's motion for summary judgment. For the reasons discussed below, we deny the motion with respect to Count I and grant the motion with respect to Counts II and V.

## SUMMARY OF FACTS

William LeDonne owned and operated[1] an Ace Hardware store located at 3310 N.

---

[1] The parties argue about LeDonne's title, with AXA insisting on labeling LeDonne as "president" of Ace and LeDonne insisting on "operator" or "manager." (*See* Def. Resp. to Pl. Facts ¶ 1, 22; Def. Facts ¶ 1; Reply at 1–2; Resp. at 17.) Because the contract language and relevant legal standard focus on job duties and not job title, this argument is irrelevant. For purposes of this order, we refer to LeDonne as "owner-operator" of Ace without passing judgment on his official title.

1

Central Avenue in Chicago. (Def. Facts ¶ 1.) His job duties as owner-operator are a central issue in this case and will be addressed at length below.

In 1996, William Canady approached LeDonne about the purchase of an AXA total disability insurance policy. (*Id.* ¶ 5.)[2] According to LeDonne, Canady told LeDonne that the proposed policy would pay LeDonne if he became unable to work. (LeDonne Dep. at 58.) LeDonne purchased an AXA total disability insurance policy (the "Policy") in September 1996. (Def. Facts ¶ 6.)

The Policy provided coverage in the event of "Total Disability," which the Policy defined as follows:

"Total Disability" means that because of Injury or Sickness:

a.  You are unable to perform the important duties of Your Occupation; and

b.  You are not engaged in any other gainful occupation; . . . .

(Def. Ex. A.) The Policy defines "Your Occupation" as "the occupation or occupations in which You are regularly engaged at the time You become Disabled." (*Id.*) On the Policy application LeDonne identified his occupation as "Owner/Manager" of Ace and his duties as "manage retail store." (*Id.*)

On September 13, 2002, LeDonne sustained a pelvic injury in a motorcycle accident. (Def. Facts ¶ 16.) Dr. David Beigler surgically repaired LeDonne's injury on September 18, 2002. (*Id.*) On November 15, 2002, LeDonne submitted a disability claim under the Policy, alleging that he was totally disabled since the accident. (*Id.* ¶ 17.) On the claim form, LeDonne

---

[2] Paragraph 5 in AXA's Statement of Material Facts indicates that Canady's proposal to LeDonne occurred in 2006, as opposed to 1996. This appears to be a typographical error. (*See* Canady Dep. at 14.)

was required to describe the duties of his occupation in order of importance. (Def. Ex. Q.) He described them as follows:

| Duty: Managing Store | Hours spent each week: 48–60 |
|---|---|
| Description: Supervise 14 people to effect the smooth profitable operations of the business – Building & dismantling displays – Resetting Shelves – Pricing & price changes – Conventions ||
| Duty: Sales Person | Hours spent each week: 25–35 |
| Description: Customer carry outs – Cleaning – Sweeping – Mopping – Shoveling Snow – Whatever else needs to be done – Ordering ||
| Duty: Office Work | Hours spent each week: 15–25 |
| Description: Supervise office staff – Payroll – Accounts payable & receivable – Daily mail – Ordering – Accounting – General ledger – Price changes – etc. etc. etc. ||
| Duty: Receiving | Hours spent each week: 3–5 |
| Description: Unloading delivery trucks and bringing merchandise into the store – Preparing merchandise for stocking ||

(*Id.*) LeDonne did no work at ACE from September 14, 2002 to January 6, 2003, (Def. Facts ¶ 16), and after the required 90-day waiting period AXA made payments to LeDonne under the Policy from December 14, 2002, through January 12, 2003, (*Id.* ¶ 19).

On January 6, 2002, Dr. Beigler cleared LeDonne to return to "light duty work lifting no more than 25 pounds." (*Id.* ¶ 20.) On January 17, 2002, LeDonne told AXA's Vocational Rehabilitation Consultant Ellen Chambers that he had returned to ACE forty hours per week, but that "he can't perform most of his job." (Def. Ex. S.) Specifically, LeDonne told Chambers that "the problem is his inability to do the physical part of the job," and that "if it weren't his own business he wouldn't be there and he wouldn't pay himself." (*Id.*) At this time LeDonne stated that he was able to review mail, do some accounting work, talk to customers, and supervise employees. (*Id.*)

3

On January 29, 2003, AXA informed LeDonne by letter that it believed he was able to perform the important duties of his occupation, was currently engaged in that occupation, and was no longer totally disabled. (Def. Ex. T. at 1–3.) AXA stated: "You currently review the mail, perform accounting duties, supervise employees, and talk to customers." (*Id*. at 1.) AXA believed that LeDonne's physical limitation did not limit his "ability to perform the duties of an owner/operator (managing the store, supervising, sales, administration)." (*Id*. at 2.) Consequently, AXA informed LeDonne that he would no longer receive disability benefits. (*Id*. at 3.)

On February 7, 2003, LeDonne requested an appeal of AXA's decision that he was not totally disabled. (Def. Facts ¶ 22.) In his letter, LeDonne stated that although he was now present at his business forty hours per week, he was only working twenty to twenty-five hours per week and was only there "because I own the business." (Def. Ex. B, Ex. 15 thereto.) LeDonne claimed that the "sedentary light duty" restriction placed on him by Dr. Beigler prevented him from "performing the important duties of [his] occupation. (*Id*.) Specifically, LeDonne claimed to be unable to unload delivery trucks, make customer deliveries, climb ladders, perform heavy lifting, or stand for more than two hours at a time. (Def. Facts ¶ 22.) LeDonne stated that he was able to review mail, do some accounting work, talk to customers "approximately 25% compared to pre-injury," and supervise employees "only at a percentage of pre-injury abilities." (Def. Ex. B., Ex. 15 thereto.)

Before AXA decided the appeal, various doctors evaluated LeDonne's injury. As noted above, on January 6, 2003, Dr. Beigler limited LeDonne to "light duty" work. (Def. Facts ¶ 20.) On February 6, 2003, Dr. Beigler again restricted LeDonne to "light duty – sedentary" work.

4

(Pl. Ex. C.) Dr. Beigler testified at his deposition that in LeDonne's case he used the terms "light duty" and "sedentary" interchangeably.[3] (Beigler Dep. at 33, 90.) On February 24, 2003, Dr. Beigler spoke with AXA's orthopedic consultant Dr. Nabil Malek about LeDonne's injury, which Dr. Beigler classified as "some anterior bone spurring at the right sacroiliac joint" and "significant stenosis" of the lumbar spine. (Def. Ex. V.) Dr. Beigler told Dr. Malek that LeDonne had "significant limitations" and should not lift more than twenty pounds, climb stepladders, stand or walk continuously for more than thirty minutes, or sit upright continuously for more than one hour. (*Id.*)

On March 28, 2003, AXA denied LeDonne's appeal. (Pl. Ex. E.) AXA stated that LeDonne was performing some of the important duties of his pre-injury occupation, including preparing the store to open, verifying paperwork, handling the mail, completing office work and month-end paperwork, and supervising employees in a reduced capacity. (*Id.* at 3.) AXA concluded: "Given the restrictions and limitations as outlined by your physician and the fact that you continue to perform some of the duties of Your Occupation, it is our position that you are not eligible for Total Disability at this time." (*Id.*)

On April 15, 2003, LeDonne again appealed AXA's decision that he was not totally disabled. (*See* Def. Ex. W at 4.) In connection with this appeal, LeDonne was asked to provide an updated list of his important job duties. (*Id.*) LeDonne provided to AXA a list substantially similar to the original list he provided with his insurance policy application, except that the

---

[3] AXA does not dispute that Dr. Beigler testified in this way but does dispute Dr. Beigler's statement itself. (*See* Def. Resp. to Pl. Facts ¶ 11.) AXA claims that "'lifting no more than 25 pounds' is inconsistent with a sedentary restriction." (*Id.*) Whether Dr. Beigler lied in his deposition about using "light duty" and "sedentary" interchangeably is a question of credibility best suited for trial.

5

updated list rearranged the order of the items. (*Id*. at 4–5.) LeDonne also listed the duties he was currently able to perform: "Office Work: 3–6 hours per week – Duties: prepare cash drawer, verify paperwork, check mail, close general ledger monthly, sign checks." (*Id*. at 5.) AXA denied this appeal on August 14, 2003 because LeDonne was able "to perform some of the important duties of his occupation in a reduced capacity." (*Id*.) On September 20, 2003, LeDonne advised AXA by letter that his pain prevented him from being on his feet for more than half an hour at a time. (*Id*.) AXA continued to investigate LeDonne's claim, (*id.* at 5), sending its field consultant Steve Page to meet with LeDonne in October 2003 and requesting information about LeDonne's job duties from Ace district manager Fred Lewis, (Pl. Ex. G. at 3–4).

Meanwhile, doctors continued to evaluate LeDonne's injury. On May 2, 2003, Dr. Prasad Gourineni examined LeDonne and concluded that LeDonne's pain came from his right sacroiliac joint. (Def. Ex. F, Ex. 3 thereto at B000007.) On October 9, 2003, Dr. Beigler reviewed the results of a bone scan, believing them to "confirm the diagnosis of right sacroiliac post traumatic arthritis." (*Id*. at B0000025.) On October 13, 2003, Dr. Beigler sent a letter to AXA stating his opinion that LeDonne "should not be working on his feet whatsoever." (*Id*. at B000026.) In February 2004, Dr. Beigler reiterated that LeDonne should restrict his work to "light duty." (Def. Ex. F, Ex. 8 thereto.)

On December 14, 2004, AXA sent LeDonne a letter reaffirming its decision that LeDonne was not totally disabled. (Def. Ex. W.) AXA "noted that much attention has been given to defining the important duties of Mr. LeDonne's occupation." (*Id*. at 1.) AXA reviewed the history of LeDonne's case, highlighting alleged changes in LeDonne's statements about

which of his pre-injury job duties were most important. (*Id*. at 1–6.) AXA stated that LeDonne's presence in the store "to protect his investment" indicated an oversight management function. (*Id*. at 5.) AXA also stated that LeDonne continued to order goods, evaluate prices, perform limited customer service, answer questions from employees, complete month-end record keeping, and answer the telephone. (*Id.* at 5–6.) Accordingly, AXA believed that LeDonne was able to perform some of the important duties of his occupation, that he was performing those duties, and that he was therefore not totally disabled under the Policy. (*Id*.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those portion of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. V. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

**ANALYSIS**

Jurisdiction in this case is based on diversity of citizenship. Because the parties do not dispute that the forum state's law applies and there is no conflict of law issues, the substantive law of Illinois governs. *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir. 1997); *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991).

**A.     Breach of Contract**

LeDonne claims that AXA breached the Policy when it ceased making payments in January 2003. To prove this claim, LeDonne must show that at some time after January 2003 he met the Policy's definition for total disability. Total disability under the Policy requires two elements. First, LeDonne must show that he was unable to perform the important duties of his pre-injury occupation. Second, he must show that he was not engaged in any other gainful occupation.

*1.     Ability to Perform Important Duties of Occupation*

The parties agree that *McFarland v. General American Life Ins. Co.*, 149 F.3d 583 (7th Cir. 1998) ("*McFarland I*") and *McFarland v. General American Life Ins. Co.*, 210 F.3d 375, 2000 WL 125746 (7th Cir. Jan. 21, 2000) ("*McFarland II*") govern this case. In the *McFarland* cases, the Seventh Circuit reviewed a total disability insurance policy that defined "total disability" as "unable to perform the material and substantial duties of [the insured's] regular occupation." *McFarland I*, 149 F.3d at 586. Determining whether an insured meets this definition requires a two-step, fact-based analysis. *McFarland I*, 149 F.3d at 588; *McFarland II*, 2000 WL 125746, at *3. First, the district court must identify those duties that the insured performed in his pre-injury occupation. *Id*. Second, the court must "evaluate whether the

8

[insured's] injuries cause a qualitative or quantitative reduction in capacity such that he could no longer operate" in his pre-injury occupation. *McFarland II*, 2000 WL 125746, at *3.

A qualitative reduction occurs when the insured loses the ability to perform only one of several essential duties, but the unperformable duty is so essential to the insured's occupation that not performing it prevents the insured from continuing in the occupation. *Id*. A qualitative reduction could cause total disability "even if, in percentage terms, the disability affected an essential duty that comprised, for example, only 5% of the person's overall duties." *Id*. As an example, the court in *McFarland I* refers to a baseball shortstop who loses the ability to throw. Although he can still run, catch, and hit, his inability to perform the essential task of throwing renders him incapable of continuing to be a shortstop. *Id*. at 587–88.

In contrast, a quantitative reduction occurs when an injury does not "physically prevent an employee from performing any given task, but the injury instead renders the person unable to perform enough of the tasks or to perform for a long enough period to continue working at his regular occupation." *Id*. at 588. For example, a person who is still able to perform each important duty but "is reduced perhaps to 25% of the prior output," could be considered unable to perform the essential duties of an occupation. *Id*.

As the owner-operator of a small business, LeDonne had many job duties. The parties generally do not dispute what LeDonne's pre-injury duties were.[4] At the time he submitted his claim, LeDonne divided his important duties into four main categories: management, sales,

---

[4] In contrast, the parties bitterly dispute how LeDonne's duties should be ranked in terms of importance and which duties LeDonne was able to perform after his injury. However, *McFarland* step-one requires us only to assemble a list of duties; the relevance of each list item is to be addressed in step-two.

paperwork, and receiving. Within these categories, LeDonne listed numerous specific job duties including supervising employees, building and dismantling product displays, resetting shelves, setting and changing prices, attending conventions, helping customers carry out purchases, sweeping, mopping, shoveling snow, ordering product, overseeing payroll and accounts, reviewing daily mail, maintaining books, unloading delivery trucks, and preparing merchandise for stocking. (Def. Ex. Q.) LeDonne submitted subsequent lists to AXA with a few additional duties, however for present purposes we believe the list submitted with his original claim fairly represents LeDonne's duties.

Having established LeDonne's pre-injury job duties, we must now evaluate whether his injury created a qualitative or quantitative reduction in his ability to perform these duties such that he was unable to continue his pre-injury occupation of owner-operator of Ace. It is clear from the facts that LeDonne suffered some degree of both qualitative and quantitative reductions. His injury created a qualitative reduction by entirely preventing him from lifting heavy loads and thus from performing certain physical pre-injury duties such as unloading delivery trucks and restocking shelves. In addition, his injury created a quantitative reduction by limiting his ability to stand or sit continuously and thus reducing his capacity to perform many other of his duties, especially customer service and employee supervision. It is not clear from the facts, however, whether these reductions prevented him from functioning as owner-operator of Ace.

On the one hand, LeDonne's injury caused the qualitative and quantitative reductions just mentioned: it prevented him from unloading delivery trucks and stocking shelves and reduced his ability to serve customers and supervise employees. LeDonne's vocational rehabilitation

expert James Boyd testified by affidavit that this reduced work capacity prevented LeDonne from performing his occupation as he did prior to his injury. (Pl. Ex. F.) According to Boyd, "the essential functions of merchandising, staff training/supervision, and customer service are integral to Mr. LeDonne's position and beyond his physical capacity." (*Id.*) In Boyd's opinion, "Mr. LeDonne's functional restrictions preclude him from performing . . . as owner/manager of Ace." (*Id.*) A reasonable trier of fact could conclude that the physical limitations caused by LeDonne's injury prevented him from functioning as owner-operator of Ace.

On the other hand, many aspects of LeDonne's occupation as owner-operator were not affected by his injury. After his injury, LeDonne was fully able to set prices, maintain books and records, review mail, and attend conventions. In addition, LeDonne was able to assist customers and supervise his employees in a reduced capacity. LeDonne also retained his authority as owner-operator of Ace and maintained a stable income level. A reasonable trier of fact could also conclude that despite his physical limitations, LeDonne continued to function after his injury as owner-operator of Ace.

Because more than one reasonable conclusion can be drawn regarding whether LeDonne after his injury was able to function as the owner-operator of Ace, we cannot decide this issue on summary judgment.[5]

### 2. *Not Engaged in Any Other Gainful Occupation*

Even though AXA has not shown as a matter of law that LeDonne was unable to perform

---

[5] Furthermore, in its filings and claim correspondence, AXA has questioned the credibility of LeDonne and Dr. Beigler. (*See, e.g.*, Def. Resp. to Pl. Facts ¶ 11 (claiming Dr. Beigler's deposition testimony is "inconsistent"); Def. Ex. W at 4 (noting discrepancies in the various lists of job duties submitted to AXA by LeDonne).) Such questions of witness credibility are best answered at trial.

his important duties as owner-operator of Ace, AXA can still prevail on summary judgment if it can show that LeDonne was engaged in other gainful employment. AXA cannot meet this burden.

Without citing any authority, AXA argues that even if after his injury LeDonne was unable to perform the important duties of his occupation, he was at least engaged in gainful occupation upon his return to Ace in January 2003. (Mot. at 16.) Consequently, according to AXA, he was ineligible for total disability benefits. (*Id*.) In its Reply brief, AXA expands its argument, still without authority, by emphasizing that after his injury LeDonne continued to receive financial compensation from Ace at levels comparable to his pre-injury compensation. (Reply at 9–11.) According to AXA, LeDonne is simply "double-dipping" by trying to collect insurance benefits for a period in which he was receiving full benefits as owner of Ace. (*Id*. at 11.)

We disagree. AXA offers no definition of "gainful employment." Instead, AXA merely points to LeDonne's owner-operator compensation. It is questionable whether compensation as an owner, in itself, is sufficient to show a "gainful occupation." At one extreme, a purely passive corporate shareholder who collects dividends is compensated as an owner, but surely her ownership is not her "occupation." On the other extreme, for an active owner-operator of a small business, like LeDonne prior to his injury, surely ownership *is* his occupation. As discussed above, whether after January 2003 LeDonne was still engaged in his pre-injury occupation is an open question. We believe there is also an open question as to where after January 2003 LeDonne fell on the spectrum between the passive shareholder and the active owner-operator. Consequently we cannot at this time determine as a matter of law whether after January 2003

12

LeDonne was engaged in any gainful occupation.

Furthermore, by pointing to LeDonne's compensation as evidence that he does not qualify for total disability coverage, AXA appears to contradict itself. AXA does not contest that LeDonne was totally disabled from the time of his injury until his return to Ace in January 2003. We may reasonably infer in LeDonne's favor—as we are required to do—that during this time LeDonne continued to receive compensation as the owner of Ace. Accordingly, prior to LeDonne's return to Ace and in direct contrast to it current argument, AXA appears to have taken the position that being compensated as an owner did not constitute "gainful occupation" under the Policy. By maintaining these contradictory positions, AXA has not carried its burden of showing that no genuine issue of material fact exists regarding whether LeDonne was engaged in gainful occupation after his injury.

Accordingly, we deny summary judgment on LeDonne's breach of contract claim.

### B. Vexatious and Unreasonable Denial of Insurance Coverage

The Illinois Insurance Code permits a court to award attorney's fees and statutory damages when an insurer is "vexatious and unreasonable" in denying coverage. 215 ILCS § 5/155. Whether an insurer acted vexatiously and unreasonably is within discretion of the district court, *Med. Protective Co. v. Kim*, 507 F.3d 1076, 1086 (7th Cir. 2007) (citing *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1109 (7th Cir. 2000)), and it is an appropriate question for summary judgment even if fact questions prevent summary judgment on the issue of coverage. *O.T. Food & Liquor v. Hartford Ins. Co.*, 95 C 0845, 1996 WL 131805, at *5 (N.D. Ill. Mar. 21, 1996); *see also Horning Wire Corp. v. Home Indem. Co.*, 8 F.3d 587, 590 (7th Cir. 1993). "A court should consider the totality of the circumstances," including "the

insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of his property." *Siwek v. White*, 388 Ill. App. 3d 152, 159, 905 N.E.2d 278, 284 (1st Dist. 2009) (quoting *Gaston v. Founders Ins. Co*, 365 Ill. App. 3d 303, 325, 847 N.E.2d 523 (1st Dist. 2006)). However, attorney's fees are not appropriate "simply because an insurer takes an unsuccessful position in litigation"—evidence must show that "the insurer's behavior was willful and without reasonable cause." *Citizens First*, 200 F.3d at 1110 (citing *Morris v. Auto-Owners Ins. Co.*, 239 Ill. App. 3d 500, 509, 606 N.E.2d 1299, 1305 (4th Dist. 1993)). Specifically, "[i]f there is a bona fide dispute regarding coverage—meaning a dispute that is real, genuine, and not feigned—statutory sanctions are inappropriate." *Med. Protective Co.*, 507 F.3d at 1087 (internal quotation and citations omitted); *see also Citizens First*, 200 F.3d at 1110 ("[A]n insurer's conduct is not vexatious and unreasonable if . . . there is a bona fide dispute concerning the scope and application of insurance coverage.") (citing *Green v. Int'l Ins. Co.*, 238 Ill. App. 3d 929, 935, 605 N.E.2d 1125, 1129 (2d Dist. 1992)).

LeDonne claims that AXA has been unreasonable and vexatious in three ways. First, LeDonne claims that AXA did not properly investigate his claim of total disability prior to its original decision to cease payments. (Resp. at 15.) LeDonne compares himself to the plaintiff in *Smith v. Equitable Life Assur. Soc. of U.S.*, 67 F.3d 611 (7th Cir. 1995), in which the Seventh Circuit upheld an award of attorney's fees under § 155 when an insurance company ceased benefits payments based on the recommendation of a consulting doctor who had not examined the plaintiff. *Id*. at 618. LeDonne argues that AXA acted similarly when it ceased making payments without either examining LeDonne or consulting with Dr. Beigler. (Resp. at 15–16.) We disagree. The plaintiff in *Smith* was totally unemployed for the entire period he claimed to be

14

totally disabled. LeDonne, in contrast, was working in some capacity and was physically present in his store while allegedly disabled. AXA did not cease making payments on the basis of a questionable medical opinion like in *Smith*; it ceased making payments because it learned that LeDonne had returned to ACE forty hours per week, and it believed that LeDonne had resumed his duties as owner-operator. While LeDonne challenges AXA's determination that he had resumed or was capable of resuming his duties—a challenge that survives this order—we believe LeDonne's post-injury presence at Ace creates a "real, genuine, and not feigned" dispute over whether LeDonne remained totally disabled after January 2003.

Second, LeDonne claims that AXA unreasonably and vexatiously concluded that LeDonne's important job duties did not include physical tasks. (Resp. at 16.) LeDonne points to a March 23, 2004, letter in which AXA relies in part on the U.S. Department of Labor's job description for "Store Manager." (*See* Pl. Ex. G.) LeDonne claims that this reliance was unreasonable and justifies an award of attorney's fees and statutory damages. (Resp. at 16.) LeDonne ignores the fact that in the six-page letter, in addition to other letters, AXA relies on the Department of Labor job description as only one of several factors used to determine LeDonne's important job duties. (Pl. Ex. G at 4.) AXA states that it relied on information provided by Ace district manager Fred Lewis and the various job descriptions provided by LeDonne himself. (*Id*.) AXA also sent its field consultant Steve Page to meet with LeDonne at Ace to discuss LeDonne's case. (*See id*. at 1–2.) From this accumulated information, AXA concluded that the important duties of LeDonne's occupation could be performed within LeDonne's physical limitations. LeDonne ultimately might prove that AXA improperly characterized the important duties of his occupation, but he has not shown that AXA was vexatious or unreasonable in making its

15

characterization.

Finally, LeDonne argues that AXA was unreasonable and vexatious when it referred to LeDonne as "owner and president" twenty-four times in its summary judgment motion. (Resp. at 17.) As previously noted, *supra* note 1, the parties' obsession with LeDonne's job title escapes us. The Policy and case law clearly focus on job duties and not job title. LeDonne cites no authority to support his claim that AXA's alleged mislabeling of his job title was unreasonable and vexatious, and we see no reason to so hold. Accordingly, taking the facts in the light most favorable to LeDonne, we find that LeDonne's claim for attorney's fees and statutory damages under § 155 fails as a matter of law.

### C. Fraud

Section 2 of the ICFA protects consumers against "[u]nfair methods of competition and unfair or deceptive acts or practices" used "in the conduct of any trade or commerce." 815 ILCS § 505/2. To prevail, a plaintiff must show: (1) a deceptive act or practice by the defendant that (2) occurred in the course of trade or commerce; (3) intent by the defendant that the plaintiff rely on the deception; and (4) actual damage to the plaintiff (5) proximately caused by the deception. *Geschke v. Air Force Ass'n*, 425 F.3d 337, 345 (7th Cir. 2005) (citing *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 149, 776 N.E.2d 151, 160 (2002)). The primary element in dispute is whether AXA engaged in a deceptive act or practice. A material misrepresentation that "creates a likelihood of deception or has the capacity to deceive" is a deceptive act under the statute. *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001) (citing *People ex rel. Hartigan v. Knecht Servs., Inc.*, 216 Ill. App. 3d 843, 856, 857 N.E.2d 1378, 1387 (2d Dist. 1991)). "A misrepresentation is material if it relates to a matter upon which plaintiff could be expected to rely

16

in determining to engage in the conduct in question." *Barrington Press v. Morey*, 752 F.2d 307, 310 (7th Cir. 1985) (internal quotation omitted); *see also Kitzes v. Home Depot, U.S.A., Inc.*, 374 Ill. App. 3d 1053, 1061, 872 N.E.2d 53, 60–61 (1st Dist. 2007).

LeDonne claims that Canady, as an agent of AXA, materially misled LeDonne when Canady stated that if Ledonne "were not able to do [his] job that this policy would pay [him]." (Resp. at 17.) LeDonne claims that through this statement Canady and AXA materially misrepresented AXA's intent regarding how it would construe the Policy. In contrast to Canady's statement, according to LeDonne, AXA intended to "construe Total Disability in a manner that focused on the non-physical aspects of LeDonne's job," in an effort to avoid paying LeDonne even if he was unable to do his job. (*Id*. at 17.)

AXA counters that the statement is not a misrepresentation, let alone a material misrepresentation that qualifies as a deceptive business practice. (Mot. at 21; Reply at 13–15.) We agree. Under the Policy's terms, AXA was required to pay benefits to LeDonne if he became totally disabled. To be totally disabled, LeDonne had to be unable to perform the important duties of his occupation, or in other words unable to do his job. Thus, Canady's statement that the Policy would pay LeDonne if he "were not able to do [his] job" is true. This statement does not become a misrepresentation simply because AXA and LeDonne now dispute whether LeDonne was able to do his job after January 2003. In fact, AXA's payments to LeDonne prior to his return to Ace in January 2003 are evidence that Canady's summary of the Policy was accurate—when AXA believed that LeDonne was unable to do his job, AXA paid LeDonne under the Policy.

Because LeDonne has not identified any deceptive act or practice by the Defendants, his ICFA claims fail as a matter of law.

**CONCLUSION**

For the reasons discussed above, we deny AXA's motion for summary judgment with respect to Count I and grant the motion with respect to Counts II and V. It is so ordered.

                                              MARVIN E. ASPEN
                                              United States District Judge

Dated: November 2, 2009